Opinion for the court filed by Circuit Judge RADER.
Dissenting opinion filed by Circuit Judge DYK.

*1319
Background,

RADER, Circuit Judge.
After the U.S. District Court for the District of Delaware construed the relevant claims, a jury found SeaChange International, Inc. (SeaChange) to have willfully infringed, literally and under the doctrine of equivalents, claims 1-4, 6-10, 12, and 14 of nCube Corporation’s (nCube’s) U.S. Patent No. 5,805,804 (Sept. 8, 1998) (the ’804 patent). The trial judge denied SeaChange’s motions for Judgment as a Matter of Law (JMOL) on literal infringement, willfulness, and indirect infringement for incomplete systems sold to Seientifie-Atlanta Corp., but vacated the jury’s verdict of infringement under the doctrine of equivalents. The judge also denied SeaChange’s motion requesting a new trial, and awarded nCube double its actual damages and two-thirds of its attorney fees. Because the court properly decided the JMOL motions, this court affirms. Because the trial court did not abuse its discretion in making its damages and attorney fees awards, this court also affirms those awards.

Discussion

This court applies the same standard of review as that applied by the trial court when reviewing a JMOL motion following a jury verdict. See Callicrate v. Wadsworth Mfg., Inc., 427 F.3d 1361 (Fed.Cir.2005). Thus, to prevail, SeaChange must show that the jury lacked substantial evidence for its verdict, viewing the evidence most favorably to the non-movant. See Kinnel v. Mid-Atlantic Mausoleums, Inc., 850 F.2d 958, 962 (3d Cir.1988).
A jury verdict of willfulness requires a finding “by clear and convincing evidence in view of the totality of the circumstances that [the defendant] acted in disregard of the ... patent and lacked a reasonable basis for believing it had a right to do what it did.” Amsted Indus. Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 181 (Fed.Cir.1994). Therefore, “[this court] must determine whether there is substantial evidence, when viewed as a whole, upon which a jury could [find willful infringement] under the clear and convincing evidence standard.” Braun, Inc. v. Dynamics Corp. of Am., 975 F.2d 815, 822-23 (Fed.Cir.1992).
This court reviews a district court’s exceptional case finding for clear error. Pharmacia & Upjohn Co. v. Mylan Pharms., Inc., 182 F.3d 1356, 1359 (Fed.Cir.1999). Criteria for declaring a case exceptional include willful infringement, bad faith, litigation misconduct, and unprofessional behavior. See Sensonics, Inc. v. Aerosonic Corp., 81 F.3d 1566, 1574 (Fed.Cir.1996). This court reviews increased damages awards or attorney fees for abuse of discretion. Electro Scientific Indus., Inc. v. Gen. Scanning Inc., 247 F.3d 1341, 1349 (Fed.Cir.2001).
The denial of a motion for a new trial is a procedural issue not unique to patent law which this court reviews under the law of the appropriate regional circuit — in this ease, the United States Court of Appeals for the Third Circuit. Union Carbide Chems. & Plastics Tech. Corp. v. Shell Oil Co., 308 F.3d 1167, 1182 (Fed.Cir.2002). The Third Circuit reviews a district court’s decision whether to grant a new trial on the basis that the verdict is against the weight of the evidence, for abuse of discretion. Greenleaf v. Garlock, Inc., 174 F.3d 352, 366 (3d Cir.1999).
A. Claim Interpretation
The ’804 patent claims a “Method and Apparatus for Scalable, High Bandwidth Storage Retrieval and Transportation of Multimedia Data on a Network.” The ’804 patent provides “a better means and method for providing multimedia data in a net *1320 worked system,” (Col.2, 11.15-16) * by allowing a client flexible access to various multimedia sources over a network. Claim 1 of the ’804 patent teaches:
1. A high bandwidth, scalable server for storing, retrieving, and transporting multimedia data to a client in a networked system, said server comprising:
an upstream manager receiving messages from said client and routing said messages to an appropriate service on said server, said upstream manager being coupled to a first network; a downstream manager sending a stream of said multimedia data from said appropriate service on said server to said client, said downstream manager being coupled to a second network; and
a connection service for maintaining information to connect said client, said upstream manager, said downstream manager, and said appropriate service on said server.
In the invention, as shown in Fig. 6 from the ’804 patent below, the client communicates his desires to the system using a client device 110. The upstream manager 220 accepts a message, e.g., a request for a particular service, from the client device and routes them to the media server service 322, which will supply that service.
[[Image here]]
The client may request such services as interactive shopping, news, games, education, movies, etc. The downstream manager 210 sends the data, i.e., the requested service, to the client device 110. (Col.16, 11.11-18) The additional elements in the figure deal with managing the requested service data flows to the requesting client, including obtaining and associating the addresses of the client and the appropriate media server.
*1321 This court must interpret the terms governing operation of an “upstream manager” and use of addresses in the invention. As mentioned, the invention of the ’804 patent allows the client to receive requested material from different types of networks. This function, in turn, requires the invention to accommodate the addressing schemes of each separate network, which may differ from one another. In order to accommodate the different types of addresses for each data link, the network protocol of the invention superimposes its own independent addresses on top of those of the nodes used in the diverse links of the various networks. (Col.13, 11.11-16.) Thus, the invention can route commands and data from the requesting client to the appropriate media server by using the system’s own network protocol. As part of this scheme, the connection service described in the specification assigns a “logical” (i.e., ad hoc) address to the “physical” address (i.e., the real physical location) of a client, in the connection manager 230. (Col.17, 11.27-51). The relationship between the logical and related physical addresses is stored in the connection service table 320.
The trial court construed the term “Upstream Manager” as follows:
Upstream Manager: a computer system component that (a) accepts messages from a client bound for services on a server; (b) routes messages from a client to services on a server; and (c) is distinct from the Downstream Manager.
The parties agree on this much of the construction, but SeaChange seeks further limitation. In particular, SeaChange contends that the upstream manager must (d) receive and route all messages from clients that are “bound for” services, and (e) must do so using only logical, not physical, addresses, of both sender and receiver of a message. SeaChange also reserves an argument of noninfringement even under the court’s claim construction.
The district court’s claim construction correctly does not require the upstream manager to receive and route all messages from a client bound for a server. The patent claims require that the upstream manager receive messages from the client and the downstream manager send data to the client, but do not make these the exclusive functions of the units. Figures 1, 2, and 6 of the specification show that the paths from the client to the upstream manager are unidireetionally upward, and from the downstream manager to the client uni-directionally downward, and the text of the specification reflects this asymmetry. (Col.3, 11.21-22.) However, the specification describes only one embodiment of the invention, and encompasses divergence from that embodiment: “[i]t may be the case that some server process, under the direction of an external network control node, actually establishes contact with the client.” (Col.17, 11.24-26). Thus, the district court correctly stated that the claims encompass this form of communication.
The trial court’s construction of “upstream manager” also correctly reflects that this element may route messages using either logical or physical addresses. In the embodiment described in the specification “all routing is accomplished based on logical addresses, not physical addresses.” (Col.23, 11.1-4). Thus, “packets (and therefore messages) only contain logical addresses of the sender and receiver.” Id. The logical address of a client is used to establish a unique “virtual circuit” for connection with that client. (Col.17, 11.28— 48). However, the upstream manager of claim 1 is broader than the upstream manager of this embodiment. The creation of a virtual circuit, or “virtual connection,” appears only in dependent claim 2 as a “further” function of the connection service. The use of a client logical address first appears specifically only in claim 4. The embodiment described in the specification, in which the service request message includes the client’s downstream logical address and a service destination logical address, is specifically described in unasserted claims 5 and 11. Claim 1 does not describe an upstream manager that *1322 requires routing only with logical addresses. To read a requirement for use of logical addresses into claim 1 would im-permissibly read the “virtual connection” limitation of claim 2 into claim 1, making these claims redundant. See, e.g., Lizard-Tech, Inc. v. Earth Res. Mapping, Inc., 424 F.3d 1336, 1344 (Fed.Cir.2005). In this case, the claim term “upstream manager” is not “so amorphous that one of skill in the art can only reconcile the claim language with the inventor’s disclosure by recourse to the specification.” Comark Commc’ns, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed.Cir.1998). It is clear that the upstream manager of claim 1 routes messages. This court need not interpret what the patentee meant by “upstream manager” in this claim by importing the limitation of claim 2 into this term. See E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co., 849 F.2d 1430, 1433 (Fed.Cir.1988) (holding that it is improper to read a limitation “into a claim from the specification wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.”). The prosecution history does not contradict the district court’s interpretation. During prosecution, the inventor differentiated the invention from the prior art of Mizuhara in several ways: not only by describing the uniqueness of its use of logical addresses, but also by demonstrating that Mizuhara did not teach a partitioned architecture, separating the functions of upstream and downstream managers, and connection service.
[[Image here]]
*1323 B. Infringement
SeaChange’s systems, used by cable TV networks, are illustrated below. In these systems, the hardware is part of a uniform network although the physical connections within the network may be of various physical types, such as coaxial cable or optical fiber. Addressing protocols are uniform throughout these systems. To receive a particular program, a client requests the program from the CM block through the block labeled DNCS. The CM then finds a free transmission channel, assigns the desired program to the free channel, and instructs the client to “tune” to that channel. In SeaChange’s Cable TV systems, the only message received (and “routed”) from the client is the request for service, which the DNCS routes to the CM. The client may interact with the service, to start, stop, rewind, etc., but that interaction is directly with the service provider.
nCube asserted at trial that the DNCS “functions as” an upstream manager, the media cluster (the star in the Figure) “operates as” the downstream manager, and the connection manager and streaming service “constitute a single component” which “ties” all the resource elements together. The jury agreed, finding that Sea-Change literally infringed the ’804 patent. SeaChange contends that its DNCS is not an upstream manager as that unit was construed by the district court.
The jury heard extensive evidence on infringement. The evidence included the testimony of nCube’s expert, Dr. Schon-feld, who opined that the DNCS routes messages to services on the server. This expert specifically stated that the upstream manager in the SeaChange system is the DNCS, which receives messages from the set-top device, and sends messages over the network. Dr. Schonfeld further opined that the DNCS routes a service request from a client to watch a specific movie. Thus, he identified the DNCS as the upstream manager. On cross-examination, Dr. Schonfeld repeated his opinion that the DNCS is an upstream manager. The jury was also presented with evidence from SeaChange’s technical documents which, it could have concluded, confirmed Dr. Schonfeld’s opinion that SeaChange’s DNCS receives messages and performs routing. SeaChange does not cite any expert or other testimony presented to the jury that contradicts Dr. Schon-feld’s opinion.
SeaChange argues to this court that this expert opinion is contradicted by the factual record and thus cannot support the jury’s verdict. See Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 242, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993) (“When an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury’s verdict.”). However, Dr. Schonfeld supported his opinion by relying on SeaChange’s own technical documents. Although the jury was not required to accept that opinion, even if it was not contradicted, U.S. Philips Corp. v. Windmere Corp., 861 F.2d 695, 704 (Fed.Cir.1988), it found Dr. Schonfeld credible. This court declines to “second guess” the jury’s determinations. Comark, 156 F.3d at 1192 (“It is not. the province of an appellate court to second guess the jury’s credibility determinations or to reevaluate the weight to be given the evidence.”) The district court accorded the jury appropriate deference. See Fuji Photo Film Co., Ltd. v. Jazz Photo Corp., 394 F.3d 1368, 1379 (Fed.Cir.2005). Therefore, this court sustains the district court’s denial of JMOL on the jury’s verdict of literal infringement.
B. Willful Infringement
The jury also found willful infringement. Willfulness requires a showing that the totality of the circumstances evince the *1324 egregious conduct that constitutes willful infringement. Imonex Servs., Inc. v. W.H. Münzprüfer Dietmar Trenner GMBH, 408 F.3d 1374, 1377 (Fed.Cir.2005).
Actual notice of another’s patent rights triggers an affirmative duty of due care to avoid infringement. See Rolls-Royce Ltd. v. GTE Valeron Corp., 800 F.2d 1101, 1109 (Fed.Cir.1986). Willful infringement in this case hinges on when the defendants had actual knowledge of plaintiffs patent rights, and their actions after that time. nCube does not argue that Sea-Change knew of the ’804 patent before it filed suit, but rather attacks Seacube’s reliance on the opinion letter it obtained after suit was filed. nCube asserts that the opinion letter, which counsel shared with Sea-Change management, was flawed because SeaChange manipulated the information given to counsel to ensure an opinion of non-infringement. nCube also casts doubt on the trustworthiness of the letter because SeaChange produced early drafts of the letter only after trial.
The record shows that at least one important technical document was not supplied to SeaChange’s opinion counsel. Thus, “the best information [was] intentionally not made available to counsel during the preparation of the opinion, [so that] the opinion can no longer serve its prophylactic purpose of negating a finding of willful infringement.” Comark, 156 F.3d at 1191. Therefore, the record contains substantial evidence upon which a jury could have found willful infringement under the clear and convincing evidence standard.
C. Indirect Infringement
SeaChange sold systems without the DNCS component to Scientific-Atlanta Corp. because Scientific-Atlanta cable systems contained their own equivalents of this component. The court’s unopposed jury instructions stated that SeaChange “would be an infringer if it actively and knowingly aided or abetted someone to make, use, sell, or offer to sell the entire product covered by the claims of the patent in suit. This is called inducing infringement.” See Hewlett-Packard Co. v. Bausch & Lomb, Inc., 909 F.2d 1464, 1469 (Fed.Cir.1990) (stating that “proof of actual intent to cause the acts which constitute the infringement is a necessary prerequisite to finding active inducement” under 35 U.S.C. § 271(b).). However, the jury verdict form did not distinguish these systems from others sold by SeaChange. Thus, the jury’s verdict that SeaChange was guilty of inducing infringement for sales of these systems was subsumed into its overall verdict of infringement.
On appeal, SeaChange argues that sales of its systems to customers using Scientific-Atlanta network equipment could not constitute indirect infringement. Sea-Change asserts that there is no evidence that it knew that these sales would result in actual infringement of the patent, so that SeaChange could not have intended to induce infringement.
To show intent for indirect infringement, “a patentee must be able to demonstrate at least that the alleged inducer had knowledge of the infringing acts.” MercExchange, LLC v. eBay, Inc., 401 F.3d 1323, 1332 (Fed.Cir.2005). Sea-Change argues that it did not have such knowledge because it did not know of nCube’s infringement allegations until this lawsuit was filed, and at that time it consulted counsel, who advised that the design of its system did not infringe the ’804 patent. In its finding of willfulness, however, the jury found otherwise.
A patentee may prove intent to induce infringement through circumstantial evidence. Metabolite Labs. Inc. v. Lab. Corp. Am., 370 F.3d 1354, 1365 (Fed.Cir.2004). The record contains sufficient circumstantial evidence to support the *1325 jury’s verdict of induced infringement. This evidence included SeaChange’s documents, as well as the testimony of Sea-Change’s vice-president of engineering, which showed that the SeaChange system operated with a customer’s own DNCS component. The record shows that Sea-Change sold ITV systems for use with Scientific-Atlanta equipment with the intent that customers would use them to perform the patented method, thus supporting the jury’s incorporation of these systems in its verdict of literal infringement.

D.Enhanced Damages and Attorney Fees

Defendants dispute the finding by the trial court that this case is exceptional. In an exceptional case, a court may award attorney fees. 35 U.S.C. § 285 (2000). Further, “the trial court has broad discretion in the criteria by which it determines whether to award attorney fees.” Brooktree Corp. v. Advanced Micro Devices, Inc., 977 F.2d 1555, 1582 (Fed.Cir.1992).
The trial court awarded enhanced damages on the basis of the jury’s willfulness finding and the Read factors for enhancing damages. See Read Corp. v. Portee, Inc., 970 F.2d 816 (Fed.Cir.1992). Most importantly, the court found that the case for literal infringement was not close. Moreover, SeaChange deliberately copied the invention in its products without investigating the scope of the patent. Thus, SeaChange had not formed a good faith belief excusing its conduct. Accordingly, the trial court declared this an exceptional case under 35 U.S.C. § 285 and awarded attorney fees. This court detects no clear error in any of the court’s subsidiary factual findings leading to its conclusion that this was an exceptional case. Further, this court perceives no abuse of discretion in the trial court’s award of attorney fees.

E.Denial of Motion for New Trial

As discussed above, the weight of the evidence was sufficient for the jury’s verdicts on literal infringement, willfulness, and indirect infringement. Therefore, this court sustains the district court’s denial of a new trial.

F.Cross-Appeal on Infringement under the Doctrine of Equivalents

The jury held that SeaChange’s systems infringed the ’804 patent under the doctrine of equivalents. The trial court granted SeaChange’s JMOL motion on this decision. During trial nCube did not raise separate and distinct arguments for infringement under the doctrine of equivalents, and elicited no expert testimony on this subject. nCube argues nevertheless that the record contains substantial evidence supporting the jury’s verdict, because the evidence supporting literal infringement of claim 10 also supports a finding of infringement under the doctrine of equivalents.
To the contrary, this court has articulated distinct rules for the evidence showing infringement under the doctrine of equivalents. See Texas Instruments, Inc. v. Cypress Semiconductor Corp., 90 F.3d 1558, 1566-68 (Fed.Cir.1996). “The party asserting infringement must present ‘evidence and argument concerning the doctrine and each of its elements.’ The evidence and argument on the doctrine of equivalents cannot merely be suhsumed in plaintiffs case of literal infringement.” Lear Siegler, Inc. v. Sealy Mattress Co. of Mich., Inc., 873 F.2d 1422, 1425 (Fed.Cir.1989) (Internal citations omitted) (Emphasis in original). Not having satisfied this evidentiary burden, nCube’s arguments do not persuade this court.

*1326
Conclusion

For the reasons stated above, this court affirms the trial court’s denials of JMOL on literal infringement and willfulness for all of the systems it sold, its award of enhanced damages and attorney fees, its grant of JMOL on the jury verdict of infringement under the doctrine of equivalents, and its denial of defendant’s motion for a new trial.
COSTS
Each party shall bear its own costs.

AFFIRMED

 All column and line references are to the '804 patent.