**nCUBE CORPORATION (now Arris Group, Inc.), Plaintiff,**

v.

**SEACHANGE INTERNATIONAL, INC., Defendants.**

**C.A. No. 01–011–LPS.**

United States District Court, D. Delaware.

Sept. 2, 2011.

---

Mary B. Graham, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, DE, Krista S. Schwartz, Sasha Mayergoyz, Stacy A. Bairn, Jones Day, Chicago, IL, for Plaintiff.

Melanie K. Sharp, Monte T. Squire, James L. Higgins, Young Conaway Stargatt & Taylor, LLP, Wilmington, DE; Steven M. Bauer, Justin J. Daniels, Proskauer Rose LLP, Boston, MA, for Defendant.

### *MEMORANDUM OPINION*

STARK, District Judge:

This patent infringement case, which began in 2001 and resulted in a permanent injunction in 2006, is on the Court's docket once again. Presently pending before the Court is a motion by plaintiff ARRIS Group, Inc. ("ARRIS") to hold defendant SeaChange International, Inc. ("SeaChange") in contempt of the Court's 2006 permanent injunction Order. (D.I. 208) The Court held a hearing to determine, under the then-existing state of the law, whether the dispute between ARRIS and SeaChange is amenable to a contempt proceeding. (D.I. 297 at 3) During the pendency of this motion, the Federal Circuit changed the law in this area in ways relevant to the Court's resolution of the issue. For the reasons that follow, the Court will proceed with a contempt hearing. The Court will reserve judgment on whether

there are colorable differences between the infringing product and the redesigned product and on whether SeaChange's modified product continues to infringe.

## I.  BACKGROUND

This suit has been pending in this Court for more than a decade and has generated several prior opinions. *See nCube Corp. v. SeaChange Int'l, Inc.*, 436 F.3d 1317 (Fed. Cir.2006) (affirming district court decision in favor of nCUBE); *nCUBE Corp. v. SeaChange Int'l, Inc.*, 313 F.Supp.2d 361 (D.Del.2004) (denying SeaChange's motion for new trial and awarding nCUBE enhanced damages). For present purposes, a brief overview of the procedural posture and technology involved will suffice.

ARRIS[1] provides, among other things, video-on-demand products and services over a network to its customers. (D.I. 209 at 1–2) ARRIS owns the rights to U.S. Patent No. 5,805,804 (the "'804 patent") entitled "Method and Apparatus for Scalable, High Bandwidth Storage, Retrieval and Transportation of Multimedia Data on a Network." (JX 1) The '804 patent teaches a media server capable of transmitting multimedia information over any network configuration in real time to a client that has requested the information. *nCUBE*, 313 F.Supp.2d at 366. In one embodiment, the technology involved allows a client to purchase a video—such as a movie—that is streamed to a device and eventually displayed on the client's screen.

On January 8, 2001, ARRIS initiated the instant litigation alleging that SeaChange, a company that also participates in the video-on-demand industry, infringed certain claims of the '804 patent through the use of SeaChange's Interactive Television ("ITV"). (D.I. 1; D.I. 209 at 2–3) The dispute resulted in a May 29, 2002 jury verdict that SeaChange willfully infringed the asserted claims in the '804 patent. (D.I. 128) This Court subsequently granted enhanced damages and allowed ARRIS to recover two-thirds of its attorneys' fees from SeaChange. (D.I. 182) The Federal Circuit affirmed the jury verdict and the district court's decisions on damages. *See nCube Corp. v. SeaChange Int'l, Inc.*, 436 F.3d 1317 (Fed.Cir.2006), *reh'g denied by NCUBE Corp. v. Seachange Int'l, Inc.*, 2006 U.S.App. LEXIS 6928 (Fed.Cir. Mar. 1, 2006).

Following the Federal Circuit's decision to affirm the jury verdict, this Court entered a permanent injunction on April 6, 2006 that enjoined SeaChange from selling products that infringe the '804 Patent. In relevant part, the Order provides:

> SeaChange, its officers, agents, servants, employees, subsidiaries, affiliates, attorneys, successors, assigns and those persons in active concert or participation with them who receive notice of this Order by personal service or otherwise are hereby enjoined, during the term of the '804 patent, from directly infringing, contributorily infringing or actively inducing the infringement of the Adjudicated Claims of the '804 patent by making, using, selling, or offering to sell within the United States or importing into the United States the SeaChange Interactive Television System that was found by the jury and adjudged to infringe the Adjudicated Claims of the '804 patent as well as any devices not more than colorably different therefrom

---

1. ARRIS was formerly known as nCUBE Corporation. nCUBE Corporation, the original plaintiff, was acquired by C–COR Corporation. Subsequently, ARRIS purchased C–COR in December 2007. (D.I. 209 at 1) For brevity and clarity, the Court will refer to nCUBE, C–COR, and ARRIS collectively as ARRIS, since ARRIS is the surviving entity presently involved in this litigation.

that clearly infringe the Adjudicated Claims of the '804 patent.

(D.I. 200)

Seven days after the 2002 jury verdict, and before the Court entered the permanent injunction in 2006, SeaChange took steps to modify its ITV system, eventually releasing a modified ITV system for testing in June 2002 that, in SeaChange's opinion, "placed it outside of the scope" of the '804 patent. (JX 103; *see also* D.I. 224 Ex. B. at 4–5; D.I. 286 at 8) These modifications to SeaChange's ITV system—and whether the newly redesigned products continue to infringe the '804 patent—form the crux of the instant dispute.

The parties engaged in a series of communications about the nature and scope of the changes SeaChange made to its ITV system. For example, ARRIS sought clarification from SeaChange about the redesign. On May 2, 2006, SeaChange responded to ARRIS's request as follows:

> In 2002, SeaChange modified its ITV system so that the Connection Manager and Streaming Service no longer maintain information on the Client ID and the Application ID. In the revised system, the Connection Manager and Streaming Service were split into two separate and distinct executables.... In SeaChange's accused ITV system, nCube asserted that the step [from claim 4] of "updating a connection service table" was satisfied when the Connection Manager/Streaming Service up-

dated its connection tables with the Client ID ("upstream physical address"). In the revised system, SeaChange has modified the Connection Manager/Streaming Service so that they are no longer one component and so that they do not maintain the Client ID in the connections tables. Thus, SeaChange's 1TV system does not "updat[e] a connection service table with said upstream physical address ..." as required by claims 4 and 10.

(JX 103)

ARRIS responded by letter on February 2, 2007. In the letter, ARRIS indicated that there was still an "open issue of liability" of whether SeaChange's redesign was successful in its attempts to avoid infringement. (JX 105) ARRIS ended by seeking an in-person meeting to discuss a potential resolution. (*Id.*) Apparently, SeaChange never responded and instead initiated an *ex parte* re-examination of the '804 patent before the Patent and Trademark Office ("PTO"). (JX 2) The '804 patent emerged from the PTO reexamination process with many claims unchanged, including claims 4 and 10. (JX 5)

Not satisfied with these communications or with SeaChange's redesigned product, on July 31, 2009, ARRIS filed the instant motion to hold SeaChange in contempt of the Court's permanent injunction.[2] (D.I. 208) According to ARRIS, SeaChange's modifications "did not remove any key components or the relevant functionality

**2.** In light of ARRIS's motion to hold SeaChange in contempt, SeaChange filed a motion to consolidate the case with its own pending action for a declaratory judgment that its Axiom on Demand system does not infringe any of the claims of the '804 patent. (D.I. 212; *see also* Civ. No. 09–573–LPS) On June 4, 2010, 2010 WL 2266335, the Court denied SeaChange's motion to consolidate and granted ARRIS's motion to stay SeaChange's declaratory judgment action pend-

ing the Court's resolution of the instant contempt proceeding. (D.I. 221) In its Order, the Court explained that, "[g]iven the substantial and lengthy previous litigation between these parties, the Court concludes that the most efficient means of addressing the parties' current dispute is to stay the Declaratory Judgment Action pending a determination of whether Contempt Proceedings are appropriate in the first instance." (D.I. 221 at 6)

that formed the basis for the jury's infringement verdict;" instead, the changes were "minor semantic changes that have no effect on any claim limitation." (D.I. 209 at 5; D.I. 280 at 2) SeaChange opposed.

The Court held a teleconference with the parties on September 23, 2010, thereafter allowing ARRIS to take limited discovery into SeaChange's ITV system, including SeaChange's original ITV system that was found to infringe. (D.I. 272) During the teleconference, the Court indicated that it viewed the issue at this stage of the litigation as very narrow: "an issue on the merits of whether the case is actually amenable to proceeding by contempt." (D.I. 272 at 20) The parties fully briefed that issue. (D.I. 280; D.I. 286; D.I. 290) The Court held a hearing on March 1, 2011, during which both parties called expert witnesses. (D.I. 298) (hereinafter, "Tr.") Additionally, the parties provided post-hearing briefing on whether ARRIS had carried its burden of showing that this dispute was amenable to a contempt proceeding. (D.I. 301; D.I. 305; D.I. 310)

On April 20, 2011, two days after post-hearing briefing was complete, the Federal Circuit issued its opinion in *TiVo Inc. v. EchoStar Corp.,* 646 F.3d 869 (Fed.Cir. 011), which changed the law of contempt in patent cases. The Court ordered supplemental briefing on the implications of the *TiVo* decision on the issues before the Court, which has now been completed. (D.I. 315; D.I. 316; D.I. 317; D.I. 318)

## II. *LEGAL STANDARDS*

*TiVo Inc. v. EchoStar Corp* changed the legal landscape for contempt proceedings in patent litigation. 646 F.3d 869 (Fed. Cir.2011). Prior to *TiVo,* district courts followed a two-step inquiry for contempt proceedings in patent cases. First, the court addressed whether the case was amenable to a contempt proceeding, which involved comparing the adjudged infringing product and the newly redesigned product to determine if "colorable differences" existed between the two. *See KSM Fastening Sys. v. H.A. Jones Co.,* 776 F.2d 1522, 1532 (Fed.Cir.1985). If there were not colorable differences—or, put differently, if there were no "substantial open issues" of infringement—a court would then proceed to the next step, which required the court to determine whether the previously adjudged infringer was actually in contempt of the injunction against infringement. This step involved analyzing whether the redesigned device infringed a claim of the patent. *See Additive Controls & Measurement Sys. v. Flowdata, Inc.,* 154 F.3d 1345 (Fed.Cir.1998).

In *TiVo,* the Federal Circuit overruled the prior two-step analytical framework for conducting contempt proceedings. *See TiVo,* 646 F.3d at 880–81. The *TiVo* Court described the prior framework as "unworkable" and, consequently, "telescoped the current twofold *KSM* inquiry into one, eliminating the separate determination whether contempt proceedings were properly initiated." *Id.* The Federal Circuit explained that a district court's decision as to whether to proceed via a contempt hearing requires only "a detailed accusation from the injured party setting forth the alleged facts constituting the contempt." *Id.* Such a decision is within the "broad discretion" of the district court "to be answered based on the facts presented." *Id.* (internal citations omitted).

Apart from condensing the two-step process, *TiVo* also clarified the standard for determining whether a party is in contempt of a court's injunction. Much of the prior standard remains intact. In determining if a previously adjudged infringer is in violation of an injunction, the inquiry continues to be whether "colorable differ-

ences" exist between the newly accused product and the adjudged infringing product: "the party seeking to enforce the injunction must prove both that the newly accused product is not more than colorably different from the product found to infringe and that the newly accused product actually infringes." *Id.* at 882; *see also Conoco, Inc. v. Energy & Envtl. Int'l.*, 460 F.3d 1349, 1365 (Fed.Cir.2006).

The Federal Circuit in *TiVo* cautioned district courts against focusing "solely on infringement" in making the contempt determination. *Id.* Under some iterations of the prior standard, district courts concentrated too heavily on whether "substantial open issues" with respect to infringement remained to be tried. Focusing solely on whether the new device infringes, *TiVo* makes clear, is improper. The "primary question on contempt should be whether the newly accused product is so different from the product previously found to infringe that it raises a fair ground of doubt as to the wrongfulness of the defendant's conduct." *TiVo*, 646 F.3d at 882 (internal quotation marks omitted). If a court answers this threshold inquiry in the affirmative, the court must then evaluate whether the modified product infringes the patent-in-suit, proceeding on a limitation by limitation basis. *Id.* at 882–83.

In a contempt proceeding, the patent holder (here, ARRIS) bears the burden of proving that the modified product is not more than colorably different than the previously adjudged infringing product; likewise, the patent holder must prove that the new product actually infringes. *Id.* The patentee's burden on both questions is proof by clear and convincing evidence. *Id.* While a contempt proceeding is not "a sword for wounding a former infringer who has made a good-faith effort" to avoid infringement, it is equally true that "to require in each instance that the patentee

institute a new infringement suit diminishes the significance of the patent and the order of the court holding the patent to be valid and infringed." *KSM Fastening Sys.*, 776 F.2d at 1530. Contempt proceedings are generally summary in nature and may be decided by the court on affidavits and exhibits without the formalities of a full trial. *See id.*; *see also* 11 Wright & Miller, Federal Practice and Procedure: Civil § 2960 at 591.

### III. *DISCUSSION*

With these general principles as guideposts, the Court now turns to the substantive issues in dispute. As noted, this case is in an unusual procedural posture: the briefing and hearing were undertaken in accordance with the prior legal framework, defined by *KSM*, but the applicable legal inquiry now before the Court is governed by *TiVo*. Under these circumstances, the Court has concluded that it is able to resolve some, but not all, of the issues in dispute, and will require further proceedings.

The discussion below proceeds in the following manner. First, the Court addresses certain affirmative defenses raised by SeaChange. Next the Court overrules each of the parties' objections to the expert testimony presented at the hearing. Finally, the Court considers the merits of ARRIS's contempt motion.

### A. *SeaChange's Affirmative Defenses*
#### 1. *Res Judicata*

■ The first issue presented concerns the applicability of the doctrine of res judicata. The dispute is whether ARRIS is foreclosed from contending that an arguably different feature of the redesigned product—namely the Session ID—satisfies the claim limitation that previously ARRIS contended was satisfied by the Client ID.

SeaChange contends that the Session ID theory ARRIS presses in this contempt proceeding is precluded under the doctrine of res judicata. (D.I. 305 at 1) SeaChange emphasizes that ARRIS's "new" theory is that the Session ID and the Client ID satisfy the same limitation in element [d] of claim 4, specifically, "updating a connection service table with said upstream physical address." ('804 patent, col. 25 lines 40–42) The problem, according to SeaChange, is that the Session ID "has existed unchanged in the SeaChange ITV system since before 2002." (D.I. 286 at 13; Tr. at 27–28) ARRIS's attempt to argue a new theory of infringement about what, in SeaChange's view, is "identical technology" runs afoul of the "bedrock principle" of res judicata. (D.I. 305 at 2)

ARRIS responds that res judicata is an issue of law for the Court to decide and, therefore, it has no bearing on whether a contempt proceeding is appropriate or whether, in fact, SeaChange is in contempt of the Court's injunction. (D.I. 290 at 12; D.I. 310 at 1) ARRIS also argues that its claim for contempt is not barred by res judicata. To ARRIS, the contempt motion arises not in a new lawsuit but in a continuation of the same litigation between the parties, which renders res judicata inapplicable. (D.I. 301 at 13) In ARRIS's view, if SeaChange's res judicata defense were accepted, patentees would be required to marshal every factual proof of every variation of every conceivable infringement argument at trial or otherwise forfeit their later right to proceed by contempt. (D.I. 310 at 1)

■ Res judicata, or claim preclusion, prevents claims that could have been brought in *a prior proceeding. See, e.g., In re Mullarkey,* 536 F.3d 215, 225 (3d Cir.2008) ("The principle of claim preclusion bars claims that were brought, or could have been brought, in a previous action."); *Lubrizol Corp. v. Exxon Corp.,* 929 F.2d 960, 963 (3d Cir.1991) ("The doctrine bars a suit where three circumstances are present: (1) a final judgment on the merits in a prior suit involving (2) the same parties or their privies and (3) a subsequent suit based on the same cause of action.") (internal quotations and citations omitted). The Court agrees with ARRIS, however, that a contempt proceeding is not a new proceeding but, rather, a continuation of the *same proceeding.*

In arguing to the contrary, SeaChange relies heavily on *Acumed LLC v. Stryker Corp.,* 525 F.3d 1319, 1321 (Fed.Cir.2008). SeaChange contends that *Acumed* stands for the proposition that a second patent infringement lawsuit can be barred if the accused product was "essentially the same" as the accused product from a prior lawsuit. *See id.* at 1325. In SeaChange's view, *Acumed* dictates that even in a contempt proceeding, if an infringement issue could have been litigated previously and the products are essentially the same, res judicata is applicable. Thus, according to SeaChange, *Acumed* requires that the Court dismiss ARRIS's claims altogether.

The Court disagrees. As an initial matter, *Acumed* makes clear that whether the products are "essentially the same" is only one factor in determining whether res judicata is applicable. More importantly, the holding in *Acumed* is predicated on the existence of a second lawsuit. The Federal Circuit begins its analysis in *Acumed* by underscoring that "[u]nder the doctrine of claim preclusion, a judgment on the merits in a *prior suit* bars a *second suit* involving the same parties or their privies based on the same cause of action." *Id.* at 1323 (emphasis added). Here, by contrast, there is no second lawsuit; the case now before the Court is the same case that has been here since 2001.

Accordingly, the Court concludes that ARRIS' contempt motion is not barred by the doctrine of res judicata.

### 2. *Equitable Defenses*

SeaChange also raises a series of equitable defenses that it submits warrants dismissal of ARRIS's motion for contempt. Specifically, SeaChange invokes: (1) laches; (2) equitable estoppel; and (3) prosecution history estoppel. (D.I. 286 at 27) [3]

■ In the Court's view, none of these issues presents a substantial issue sufficient to deny proceeding via a contempt motion. First, as ARRIS points out, laches and equitable estoppel are equitable issues to be decided by a court. *See Dewey Elecs. Corp. v. Montage, Inc.*, 117 F.R.D. 73, 74 (M.D.Pa.1987) ("The defenses of laches and estoppel are inherently of an equitable nature."); *see also Granite State Ins. Co. v. Smart Modular Techs., Inc.*, 76 F.3d 1023, 1027 (9th Cir.1996) (explaining that equitable estoppel is "preeminently the creature of equity"). The Court can hear testimony and receive evidence on both of these defenses in a contempt proceeding as easily as in a separate litigation. Accordingly, the presence of these potential defenses is not a reason to deny proceeding via a contempt hearing.

■ Likewise, the Court agrees with ARRIS that prosecution history estoppel does not justify denying ARRIS the opportunity to proceed via a contempt motion. SeaChange argues that during the reexamination process, ARRIS made statements to the examiner regarding the Tindell prior art reference. (D.I. 228 at 15) According to SeaChange, ARRIS's statements represent a clear and unmistakable disavowal of claim scope. The presence of this issue, in SeaChange's view, raises a substantial open issue and renders a contempt proceeding an inappropriate vehicle to resolve the dispute. The Court disagrees. SeaChange has not provided any convincing authority that suggests that prosecution history estoppel cannot be decided in the context of a contempt proceeding. To the contrary, even new issues of claim construction are not sufficient, in and of themselves, to disallow a contempt proceeding. *See Additive Controls,* 154 F.3d at 1350 ("[I]t was therefore permissible for the court to resolve the claim construction issue in the course of the contempt proceedings....").

At bottom, none of SeaChange's proffered defenses requires a full-blown trial in order to be resolved, and do not render contempt proceedings an improper mechanism for resolving the parties' disputes.

### B. *Expert Testimony Objections*

At the March 1 hearing, both parties made objections to expert testimony as beyond the scope of the expert's report. The Court explained it would take these objections under advisement, hear the purportedly objectionable testimony, and resolve the objections following post-hearing briefing. (Tr. at 34, 191) Both SeaChange

---

**3.** SeaChange also presses a view that ARRIS is barred from asserting its claims under the doctrine of judicial estoppel. (D.I. 305 at 12) In support of this view, SeaChange argues that statements ARRIS made in the context of opposing SeaChange's motion to consolidate—specifically statements suggesting that laches is "neither legally nor factually applicable to this contempt proceeding"—preclude ARRIS from arguing that the Court should now consider these defenses in the contempt proceeding. The Court disagrees. ARRIS's statements in the motion to consolidate merely stand for the unsurprising proposition that ARRIS disagrees that laches is applicable. ARRIS has argued consistently that laches and equitable estoppel do not apply in a contempt proceeding. (D.I. 310 at 5) ARRIS's argument is that, should the Court disagree, the defenses do not create a substantial open issue that would preclude the Court from proceeding via a contempt proceeding.

and ARRIS continue to press a number of objections to expert testimony. (D.I. 302; D.I. 303; D.I. 306; D.I. 311) For the reasons explained below, the Court overrules each of the objections.

### 1. *Legal Standards*

■ Federal Rule of Civil Procedure 26(a)(2)(B)(i)-(ii) requires that an expert report disclose a "complete statement of all opinions the witness will express and the basis and reasons for them," including "the facts or data considered by the witness in forming" the opinion. Testimony of expert witnesses is limited to the information contained in their expert reports. *See Honeywell Intern., Inc. v. Universal Avionics Sys. Corp.*, 289 F.Supp.2d 493, 500 (D.Del.2003) (excluding testimony about doctrine of equivalents because not contained in expert report). When determining whether an expert's testimony is beyond the scope of the expert's written report, courts do not require "verbatim consistency with the report, but ... allow[ ] testimony which is consistent with the report and is a reasonable synthesis and/or elaboration of the opinions contained in the expert's report." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 585 F.Supp.2d 568, 581 (D.Del.2008); *see also LG Display Co., Ltd. v. AU Optronics Corp.*, 265 F.R.D. 199, 206 (D.Del.2010).

■ A key consideration when determining whether testimony is beyond the scope of an expert report is whether the objecting party had notice of the subject matter of the testimony based on the contents of the report and elaborations made during any deposition testimony. *See Power Integrations*, 585 F.Supp.2d at 581; *see also Vandenbraak v. Alfieri*, 2005 WL 1242158, at *3 (D.Del. May 25, 2005) ("[Rule 26(a)(2)(B) ] is intended to protect opposing parties from unfair surprise...."). Motions to exclude expert testimony are committed to the court's discretion. *See Jaasma v. Shell Oil Co.*, 412 F.3d 501, 513 (3d Cir.2005) (holding that decision to admit or reject expert testimony is reviewed under an "abuse of discretion" standard). A court's decision is not an abuse of discretion unless it is "arbitrary, fanciful, or clearly unreasonable." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir.2002).

### 2. *SeaChange's Objections to Dr. Schonfeld's Hearing Testimony*

ARRIS's expert at the hearing was Dr. Dan Schonfeld. (JX 60) Dr. Schonfeld had also testified on behalf of ARRIS at the initial trial. Dr. Schonfeld provided an expert report, as well as a supplemental report, detailing his opinions on whether the modified ITV system infringes the '804 patent. (JX 62; JX 61) SeaChange objects to three portions of Dr. Schonfeld's hearing testimony as beyond the scope of his expert report. None of the objections, however, are meritorious.

■ SeaChange insists that Dr. Schonfeld's testimony about the how the modified ITV system practices elements [b] and [c] of claim 4 is beyond the scope of his expert report. (D.I. 306 at 8; *see also* Tr. at 46–47) SeaChange contends that Dr. Schonfeld "never identified the Session ID as the 'upstream physical address' for purposes of claim 4 until he offered that opinion for the first time at the hearing." (*Id.*) This is incorrect. Dr. Schonfeld disclosed this opinion on multiple occasions prior to the hearing. (*See* JX 62 at 10, 13, 15, 19, 28–29) Even *SeaChange's* second *prehearing* brief recognized that ARRIS's position was "now, the Session ID data item ... can simply take the place of the Client ID as the 'upstream physical address' for purposes of Claim 4 of the '804 patent." (D.I. 286 at 13) SeaChange, then, cannot

have been surprised at the hearing when ARRIS's long-time expert voiced this very same opinion. SeaChange's objection to Dr. Schonfeld's testimony for element [b] is, thus, overruled.

SeaChange's objection to Dr. Schonfeld's testimony relating to element [c] fares no better. (Tr. at 47–49) In his report, Dr. Schonfeld explained his understanding that the modified ITV system continued to practice element [c] in the same manner as the original ITV system. (JX 62 at 7–9, 12, 19–20) Simply because Dr. Schonfeld did not proceed in his expert report on a limitation by limitation basis does not mean that his opinion is absent from the report. The substance of Dr. Schonfeld's opinion on element [c] had also been disclosed in his testimony at trial, well before the March 2011 hearing.

SeaChange also objects to Dr. Schonfeld's hearing testimony with respect to element [d] of claim 4. (Tr. at 53–54, 78) Element [d] requires the step of "updating a connection service table with said upstream physical address." ('804 patent, col. 25 lines 40–43) SeaChange asserts that Dr. Schonfeld testified for the first time at the hearing about "how" and "where" the memory tables are updated, opining for the first time that the "Connection ID" satisfies this element. (D.I. 306 at 4)

Dr. Schonfeld's report discloses his opinion that the modified ITV system updates a connection service table with said upstream physical address and that the Session ID is the element of the modified ITV that practices the updating limitation. Dr. Schonfeld's report states, for example, that "As with the ITV product that the jury found to infringe, the Connection Manager in the ITV product from [the modified ITV system] to the present then updates the Connection Manager Bandwidth Resource

Management Tables in the Connection Manager with the Session ID." (JX 62 at 29–30) Furthermore, in the supplemental report, Dr. Schonfeld opined,

> The Session ID is then used by the CM [Connection Manager] as the 'connection key' and the CM log contains numerous lines showing the Connection Manager's use of the Session ID as the connection key.... The connection key (which is the Session ID) is stored in the CM Bandwidth Resource Management Tables .... These are the same tables that stored both the connection key (Session ID) and the Client ID in ... the SeaChange ITV system that the jury found to infringe.

(JX 61 at 7) At the hearing, Dr. Schonfeld went on to testify that the connection key was labeled "Connection ID" in the infringing product. This testimony was an acceptable synthesis and extrapolation of the opinions contained in his report. SeaChange was on notice of Dr. Schonfeld's opinion of how the modified ITV system updates a connection service table.

Accordingly, the Court will overrule all of SeaChange's objections to Dr. Schonfeld's testimony as being beyond the scope of his expert report.

### 3. ARRIS's Objections to Dr. Jeffay's Hearing Testimony

SeaChange's expert at the hearing was Dr. Kevin Jeffay. (JX 71) Dr. Jeffay had also been SeaChange's expert at trial. Like Dr. Schonfeld, Dr. Jeffay provided his opinion on whether the modified ITV system continues to infringe the '804 patent in an initial expert report as well as a subsequent supplemental report. (JX 68; JX 69) ARRIS objects to a number of Dr. Jeffay's assertions at the March 1 hearing as being beyond the scope of his expert report.[4]

---

4. ARRIS also objects to Dr. Jeffay's reliance on a glossary at the hearing. (D.I. 311 at 3)

### a. *Two SRMs*

■ ARRIS first objects to testimony from Dr. Jeffay about how the redesigned ITV system uses two Session and Resource Manager ("SRM") components. (Tr. at 154) The dispute turns on whether Dr. Jeffay's reports disclose that the redesigned ITV system necessarily has to employ two SRMs. (D.I. 311 at 6) ARRIS points out, for example, that the sections of the expert report on which SeaChange relies to support Dr. Jeffay's hearing testimony refer to "the" SRM in the singular. (JX 69 at 27–28) Thus, according to ARRIS, the expert report actually confirms that Dr. Jeffay did not disclose prior to the hearing that the system necessarily uses two SRMs.

The Court disagrees. Dr. Jeffay's report opines that, as a result of the redesign, the Connection Manager must engage in a "new and non-standard set of message exchanges." (JX 69 at 28) Dr. Jeffay's report also notes, "[t]he changes to SeaChange's programs due to the redesign" and "[w]ith the introduction of a Session and Resource Manager in every environment." (*Id.* at 27) The report discusses "extra messaging," which Dr. Jeffay explained at the hearing—and the report specifically indicates—means the redesigned system "introduces" a SRM "in every environment." (*Id.*) Moreover, Dr. Jeffay also explained in his deposition that there were two SRMs involved in the modified ITV system. (JX 76 at 274) Given the combination of these various disclosures in the expert report, ARRIS had fair notice of Dr. Jeffay's opinion that the redesigned system has two SRMs.

Accordingly, the Court overrules ARRIS's objection.

### b. *Client ID Byte–Length*

■ ARRIS also objects to Dr. Jeffay's discussion of the byte-lengths of the Session ID and the Client ID. (D.I. 311 at 6) In particular, ARRIS contends that nowhere in the expert reports does Dr. Jeffay compare the byte lengths of the Client ID and the Session ID. (*Id.* at 7)

Initially, the Court notes that the byte length of the Session ID and the byte length of the Client ID are disclosed in various places throughout the record. (JX 69 at 35; JX 52 at 44–45, 83) Indeed, both experts set forth in their reports a log entry that documents the components of the Client ID. (JX 61 at 4; JX 69 at 50) In other words, the byte length of both the Client ID and the Session ID are record evidence. The Court will not exclude references that relate only to the byte length of the two items.

The real dispute is whether Dr. Jeffay's reports disclose his opinion about the impact of the two different byte lengths. ARRIS submits that Dr. Jeffay testified at the hearing that the Session ID cannot satisfy the limitation, an upstream physical address, because it differs in byte length from the Client ID. Dr. Jeffay's testimony, however, is directed at a slightly different point: "Well, I think the title of [Dr. Schonfeld's] slides show some of the headaches that I've been having here. That it's been very difficult really to understand Dr. Schonfeld's position. Sometimes he says the Session ID is the upstream physical address, other time he says it contains the upstream physical address." (Tr. at 158–59) Based on Dr. Jeffay's expert report,

The glossary is merely a demonstrative exhibit; SeaChange is not seeking to admit the glossary into evidence. Dr. Jeffay never actually read any of the glossary definitions into the record. Moreover, the vast majority of the terms from the glossary are taken essentially verbatim from Dr. Schonfeld's own reports. (D.I. 303 at 6–7) The Court overrules ARRIS's objection to the glossary.

and his further testimony at the hearing that what is critical about the Session ID is how it is used, the Court finds that his opinion that the Session ID does not identify the client is supported in his expert reports. Indeed, Dr. Jeffay's experiments are directed to demonstrating that the Session ID does not identify the client to the ITV system, which goes to how the ITV system uses the Session ID. (JX 69 at 51–58)

Accordingly, the Court overrules AR-RIS's objections.

### c. Address v. Identifier

■ ARRIS objects to testimony from Dr. Jeffay about the difference between an "address" and an "identifier." (Tr. at 157–58) ARRIS characterizes Dr. Jeffay's testimony as relating to claim construction, specifically the meaning of the claim term "address." (D.I. 311 at 8 n. 6) ARRIS then points to the deposition of Dr. Jeffay, during which he indicated that he was not offering opinions on claim construction. (JX 75 at 233)

Initially, the Court notes that the deposition testimony to which ARRIS refers is entirely directed at whether claim 4 requires an "efficient" computer implemented method. (JX 75 at 233–34) Considering that Dr. Schonfeld's opinion is that the modified ITV system does continue to infringe the '804 patent because the Session ID "identifies" the set-top box, and further considering that Dr. Jeffay rebuts this proposition through, among other things, his discussion of his experiments, clearly the interplay of upstream physical address and whether the Session ID "identifies" the set-top box was at the forefront of the experts' reports. Regardless of whether this is a claim construction issue or an infringement issue, the Court finds that Dr. Jeffay's testimony is a reasonable synthesis or elaboration of the opinions con-

tained in his reports, and that ARRIS had fair notice of it prior to the hearing.

Accordingly, the Court overrules AR-RIS's objection.

### d. Quantitative Evidence of Performance Impacts

■ The final objection ARRIS makes involves portions of Dr. Jeffay's testimony relating to quantitative evidence of the impact the modifications had on the performance of the redesigned ITV system. (D.I. 311) At the hearing, counsel for AR-RIS asked the following question: "You had absolutely no quantitative evidence of the performance impacts at all, do you?" (Tr. at 164) Dr. Jeffay responded, "I was informed of some quantitative impacts during my initial discussions with Sea-Change." (Id.) ARRIS asserts that nothing in Dr. Jeffay's reports discloses any "quantitative evidence" and, therefore, the testimony is improper.

The Court disagrees. [Redacted] Dr. Jeffay's testimony at the hearing—in response to a question from ARRIS—is that these impacts are quantifiable. Moreover, Dr. Jeffay's report explicitly documents certain quantitative changes, including twenty new protocol changes as well as a different streaming service ratio for the Connection Manager to Streaming Service. (JX 69 at 28–29) Dr. Jeffay also testified at his deposition about the relationship between introducing new protocol exchanges into a distributed system and how this would affect the overall performance of the system. Dr. Jeffay indicated in his deposition that one could measure those changes quantitatively. (JX 75 at 224–26) [Redacted]

Accordingly, ARRIS's objection with respect to the quantitative evidence is overruled.

### C. *Amenability of a Contempt Proceeding*

The Court now turns to the merits of the contempt motion. ARRIS urges the Court that this case is not only amenable to proceeding through a contempt hearing, but also that there is already sufficient record evidence from which the Court should hold SeaChange in contempt. (Tr. at 186–90; D.I. 315 at 2) SeaChange agrees with ARRIS to the extent that, based on the record as it exists, the Court may decide the narrow issue of whether the case is amenable to proceeding via contempt; SeaChange disputes, however, that the Court may also decide whether SeaChange is in fact in contempt. (Tr. at 189 ("If you think that there is an open issue for contempt, I think two hours of evidence is sort of tough for ruling that a company is in contempt after seven years based on such a short record."))

Below, the Court first addresses an important background issue: SeaChange's repeated assertion that ARRIS is raising a new theory of contempt that is different from the theory ARRIS argued in its original contempt motion. Second, the Court considers whether to proceed via a contempt hearing. Finally, the Court discusses whether there is sufficient evidence in the record to hold SeaChange in contempt of the 2006 injunction.

### 1. *ARRIS's "New Theory" of Contempt*

■ At the outset, the Court must address an issue that permeates the parties' arguments and briefing: whether ARRIS has impermissibly shifted its theory of contempt. ARRIS's contempt motion, along with its supporting brief, was filed on July 31, 2009, and states as follows: "the only issue to be resolved is whether shifting the location of the Streaming Service to a different computer is more than a 'colorable' difference from the infringing product." (D.I. 209 at 8) Now, however, as it emerges from the briefing, the key dispute centers on whether the Session ID in SeaChange's ITV system satisfies the "upstream physical address" limitation of claim 4. (D.I. 301 at 3)

SeaChange contends that ARRIS is, thus, pressing a "new theory" that is different from the theory ARRIS initially advanced in its contempt motion. (D.I. 286 at 14–15; D.I. 305 at 4) SeaChange asserts that the fact that ARRIS must resort to a "new" Session ID theory demonstrates how a contempt proceeding is simply not an appropriate means to resolve the parties' present dispute. (D.I. 286 at 14) In SeaChange's view, there was no mention of the Session ID theory at the original trial or in ARRIS's original motion. (*Id.* at 17) Additionally, the Session ID has existed unchanged in SeaChange's ITV system since 2002—and because the Court insisted that ARRIS's contempt motion be based on a theory that it articulated originally at trial and in its motion, SeaChange contends, again, that this case is not amenable to a contempt proceeding.

The Court rejects SeaChange's argument. In April 2006, ARRIS requested information from SeaChange regarding SeaChange's modified product. In response, on May 2, 2006, SeaChange wrote to ARRIS and explained that, "[i]n the revised system, SeaChange has modified the Connection Manager/Streaming Service so that they are no longer one component and so that they do not maintain the Client ID in the connection tables." (JX 103) Thus, accepting SeaChange's representations, the modification appeared to be that the Connection Manager and the Streaming Service were no longer one component. Not surprisingly, then, ARRIS based its original contempt motion on the theory that this was the purportedly meaningful change in the modified system.

SeaChange did not initially disclose, however, that the connections tables in the modified product continue to store some of the same information—arguably the key information, i.e., the 6–byte information used to identify the set-top box—that was contained in the Client ID in the original system. ARRIS contends that it did not, nor could it have, fully understood the implications of SeaChange's modifications until discovery had progressed to a point sufficient to provide a better understanding of the technological changes Sea-Change implemented.

The Court agrees. In fact, in ARRIS's expert's declaration that accompanied AR-RIS's motion for contempt, ARRIS's expert opined: "It is my understanding that the combination of the Connection Manager and Streaming Service maintains and updates information regarding the upstream physical address, such as the Client ID." (D.I. 209 Ex. D at 3) In other words, ARRIS's expert declaration demonstrates that the Session ID theory is not in fact different: ARRIS simply uncovered, in discovery, that the Session ID, as opposed to the Client ID, contains the information regarding the upstream physical address. ARRIS contends now, as it has all along, that if the Connection Manager and Streaming Service update and maintain in the connection tables information that provides the system an upstream physical address, the new product is not more than colorably different and, therefore, the new system infringes the '804 patent. Simply because the dispute has taken shape more clearly—and ARRIS' understanding of SeaChange's new product has advanced from what it understood based on Sea-Change's initial description of the new system—does not mean that ARRIS's theory of contempt has changed.

This is not to say that ARRIS's new theory of infringement is correct (or incor-

rect) or that the Court agrees (or disagrees) that the Session ID can satisfy the upstream physical address limitation. Nor does the Court express any opinion about SeaChange's assertion that the information contained in the Session ID is not actually *used* by the modified ITV system to identify the client. (D.I. 286 at 23) As explained below, those are issues on which the Court is reserving judgment until after further proceedings. What the Court has concluded is only that ARRIS' theory of contempt has not materially nor improperly evolved.

### 2. *Proceeding by a Contempt Hearing*

In the Court's Order granting ARRIS's motion to stay SeaChange's related declaratory judgment action, the Court explained that the issue presented in the instant action is merely the "threshold" question of whether contempt proceedings are the appropriate mechanism to resolve the parties' dispute. (D.I. 221 at 6) In a subsequent teleconference, the Court described "the basis for moving for contempt" as "narrow[ ]." (D.I. 272 at 19–20) Similarly, the Court's Order on post-hearing submissions identified the pending issue as *"whether ARRIS has carried its burden of proving that this dispute is amenable to a contempt* proceeding." (D.I. 297) (emphasis in original)

■ Under the law at the time the Court held the contempt hearing, the Federal Circuit mandated a two-step inquiry, with the first step being to determine whether there were colorable differences between the accused product and the infringing product. If there were no colorable differences, the Court could continue with a contempt proceeding. The second step was then to determine whether the redesigned product continued to infringe every limitation and was, therefore, in violation of the Court's injunction. *See KSM Fastening Sys.*, 776 F.2d at 1532; *see also*

*Additive Controls*, 154 F.3d at 1353. Subsequently, as the Court has already explained, the Federal Circuit decided *TiVo*, 646 F.3d at 901–02, which holds that a court may, in its discretion, proceed on a contempt motion based on just "a detailed accusation from the injured party setting forth the alleged facts constituting the contempt."

Under the new *TiVo* standard, ARRIS has clearly satisfied its burden to show that the parties' dispute is amenable to resolution by way of a contempt proceeding. Indeed, ARRIS has gone well beyond stating the alleged facts that constitute contempt. ARRIS has alleged that Sea-Change's modified ITV system infringes claim 4 of the '804 patent. (D.I. 301 at 3) ARRIS has put forth testimony that the first three claim limitations of claim 4, elements [a]-[c], are not in serious dispute. (*Id.*; *see also* Tr. at 42–50) ARRIS has also articulated what is at least a plausible theory of how the modified ITV system continues to practice limitation [d]. (D.I. 301 at 4) While *TiVo* did not provide much in the way of guidance for answering how much information is required to constitute a "detailed accusation," the Court finds that ARRIS's motion, combined with its extensive briefing and record evidence, is sufficiently detailed. The Court therefore finds that this case is amenable to a contempt proceeding.

### 3. *Colorable Differences Analysis*

*TiVo* makes clear that a Court's decision to proceed via a contempt hearing does not end the Court's inquiry. A separate question exists in this case as to whether the Court should reach the merits of ARRIS's contempt motion at this time, which would involve undertaking the *TiVo* inquiry of (1) whether a colorable difference exists between the infringing product and the modified product; and (2) whether the modified product actually infringes. *See* 646 F.3d at 883.

In conducting the colorable difference inquiry, the "primary question . . . should be whether the newly accused product is so different from the product previously found to infringe that it raises a 'fair ground of doubt as to the wrongfulness of the defendant's conduct.'" *Id.* at 882. The Court should focus on "those elements of the adjudged infringing products that the patentee previously contended, and proved, satisfy specific limitations of the asserted claims." *Id.* When an element of an infringing product has been modified or removed, the question is "whether that modification is significant." *Id.* The significance of the difference is a question of fact and is dependent on the nature of products at issue. *Id.* at 882–83.

Claim 4 of the '804 patent, which ARRIS asserts is the key claim in dispute in this contempt proceeding, recites:

A computer-implemented method for retrieving and transporting multimedia data between a client and a server on a network, said computer-implemented method comprising the steps of:

[a] an upstream manager in said server, said upstream manager being coupled to a first network;

[b] obtaining an upstream physical address for said client as said client request enters said server;

[c] allocating a downstream physical address and downstream logical address to said client corresponding to the upstream physical address obtained for said client, said downstream physical address being used by a downstream manager for sending a stream of said multimedia data from a service on said server to said client, said downstream

manager being coupled to a second network; and

[d] updating a connection service table with said upstream physical address, said downstream physical address, and said downstream logical address for said client.

('804 patent, col. 25 lines 22–43)

### a. *Limitations in Dispute*

ARRIS argues that the only limitation at issue is element [d], which requires "updating a connection service table with said upstream physical address." (D.I. 301 at 3) SeaChange initially argued that elements [a]-[c] were also in dispute. (D.I. 286 at 19–21) SeaChange's own documents belie this fact, however. First, Sea-Change's initial letter to ARRIS never stated that any of the changes it made in its ITV System affected limitations [a]-[c]. (JX 103) Likewise, SeaChange's expert, Dr. Jeffay, initially identified only elements of limitation [d] as the basis for his non-infringement opinion. (JX 68 at 5) In his initial declaration, for example, Dr. Jeffay stated that the modified ITV system did not contain or use a "connection service" or a "connection service table," as required by the '804 patent. *Id.* Each of those limitations is found only in element [d] of claim 4. Moreover, while SeaChange argued in passing at the hearing that elements [a]-[c] were not satisfied, Dr. Jeffay never substantively rebutted Dr. Schonfeld's testimony that the modified product continues to practice elements [a]-[c]. (Tr. at 32; Tr. at 147–63 (focusing solely on Session ID and Client ID))

Hence, the limitation in dispute involves element [d]. The question presented is whether the Session ID, which ARRIS contends is the replacement for the infringing Client ID, satisfies the limitation of updating a connection service table with said upstream physical address.[5]

### b. *Element [d]*

*TiVo* holds that contempt may be based only on elements of the infringing device that were alleged and proven at trial to satisfy specific limitations of the claims of the patent-in-suit. *See* 646 F.3d at 881–82. Hence, any analysis about whether colorable differences exist with respect to the modified ITV product must focus on how ARRIS alleged and proved to the jury that SeaChange's older ITV system practiced the limitations in element [d]. In particular, a key question is whether Dr. Schonfeld's testimony at trial regarding the "upstream physical address" referred only to the Client ID or, instead, referred to a more general understanding of what satisfied the upstream physical address limitation.

SeaChange contends that Dr. Schonfeld testified at trial about a specific definition of upstream physical address. Sea-Change's theory that the modified ITV system is colorably different from the infringing ITV System is essentially that, since Dr. Schonfeld identified the Client ID as satisfying the "upstream physical address" limitation of element [d], and the modified system removed the Client ID, the modified system no longer practices this limitation. SeaChange's argument is predicated on the idea that Dr. Schonfeld's opinion at trial identified to the jury *only* the Client ID as satisfying the upstream physical address limitation.[6]

---

**5.** While elements [b] and [c] contain the same "upstream physical address" limitation as element [d], resolution of the parties' dispute as to the entire limitation of "updating a connection table with said upstream physical address," which appears only in element [d], will resolve the "upstream physical address" issue presented in elements [b] and [c] as well.

At the March 1 hearing, Dr. Schonfeld did not dispute that the Client ID was an example of the upstream physical address about which he opined before the jury at the trial. However, he characterized his trial testimony as "present[ing] a general description of upstream physical address which *includes* the Settop ID and the Client ID." (Tr. at 101 (emphasis added)) Dr. Schonfeld's testimony at the hearing was credible. The Court concurs that his hearing testimony was consistent with his trial testimony. At the 2002 trial, when Dr. Schonfeld was testifying about how the ITV system infringed claim 4, he explained to the jury that "upstream physical address" contains what is known as a "client ID." (JX 59 at 574) Dr. Schonfeld further testified at trial that "[t]he upstream physical address ... is what is known as the top set-top ID ... The set-top and client are used interchangeably, they refer to ... the set-top sitting at home. And the ID is the address used by the set-top system to refer to the particular client, by the ITV system to refer to the client." (JX 59 at 577; D.I. 315 at 3) Dr. Schonfeld's trial testimony, then, was that the upstream physical address can refer to the set-top ID or the Client ID, and the crucial element that they have in common is that they refer to the set-top device sitting at home.

ARRIS presented evidence that the Session ID contains information—indeed, the same information—that likewise refers to the set-top device sitting at home. Indeed, Dr. Jeffay did not dispute that the Session ID in the redesigned ITV system contains the same 6–byte address, typically the Machine Access Control identifier (or "MAC address") that was contained in the Client ID in the infringing ITV System. (Tr. at 62–64) Dr. Schonfeld further testified that the redesigned ITV system stores the Session ID, which contains the 6–byte address, in the same Connection Table as the infringing ITV system. (Tr. at 75–77)

Faced with this bulk of evidence that the Session ID and the Client ID both contain information referring to the set-top device, normally the MAC address, SeaChange's rebuttal is two-fold. [Redacted] However, Dr. Jeffay provided no quantitative evidence of degradation of performance. Even if Dr. Jeffay had provided such quantitative evidence, however, "inefficient infringement is infringement still." *See Shamrock Techs., Inc. v. Medical Sterilization, Inc.*, 903 F.2d 789, 792 (Fed.Cir. 1990). SeaChange's second retort is that Dr. Jeffay performed a series of experiments that supposedly demonstrate that the modified ITV system does not use the Session ID as an address or identifier. (Tr. at 164–67; *see also* D.I. 286 at 24) Dr. Jeffay conceded, however, that his experiments generated an error. (Tr. at 166: "It absolutely generated an error.") Dr. Jeffay's explanation that the "error had nothing to do with the Session ID" is, at this point, unpersuasive. Dr. Jeffay explained that "one second later," when the set-top box retried, the "system worked

6. SeaChange also argues, as it has done throughout its briefing, that ARRIS may not seek to hold SeaChange in contempt because ARRIS has known since 2002 that the Session ID existed in the ITV system. SeaChange's theory, however, rests on a faulty assumption: that if ARRIS cannot demonstrate that the Session ID was the component of the infringing product alleged and proven at trial to infringe, then it cannot now argue that the Session ID is the component of the redesigned ITV System that replaces the Client ID (which indisputably was alleged and proven at trial to infringe). The Court disagrees. *TiVo* makes clear that if a redesigned product replaces a component that practiced a limitation, the redesigned component may still be held to be infringing (and therefore a basis for contempt) if the redesigned component does not amount to a significant change.

just fine." (Tr. at 168) The Court is not at this point persuaded by Dr. Jeffay's testimony that removing the Client ID and replacing it with a Session ID is a significant, colorable change.

In short, based on the record developed to this point, the Court is inclined to find that there are no colorable differences between the infringing ITV system and SeaChange's modified ITV product. At the same time, however, the Court recognizes SeaChange's observation at the March 1 hearing that it did not have a full opportunity to present all of the evidence it felt was necessary to provide the Court will a complete understanding of this issue. Dr. Jeffay, for example, only testified for approximately twenty-five minutes. (Tr. at 143; *see also id.* at 189) Moreover, as already noted, the Court has throughout the proceedings on ARRIS's contempt motion focused the parties solely on the narrow question of whether this case is amenable to a contempt proceeding; it would be unfair to SeaChange at this point to undertake the full *TiVo* inquiry on what SeaChange may contend is a limited record.

Based on these considerations, the Court reserves making a final determination on whether a significant, colorable difference exists (between the infringing ITV System and the modified system). The Court also does not, at this point, make any determination as to whether the new product infringes.[7] While the parties now have the benefit of the Court's present inclination to find no colorable difference, further proceedings may be necessary before the Court will be able to make a final finding.

---

**7.** Among the questions relating to infringement which remains open is whether the Session ID is actually used by the modified system to identify the set-top box in the same way that the Client ID was used to identify

## IV. *CONCLUSION*

The *TiVo* decision noted the tension inherent in contempt proceedings: "The [colorable difference] analysis may also take account the policy that legitimate design-around efforts should always be encouraged as a path to spur further innovation.... But an assertion that one has permissibly designed around a patent should not be used to mask continued infringement." 646 F.3d at 883. At the present time, the Court is unable to determine if SeaChange's modified ITV System constitutes a laudable design-around or an impermissible continued infringement and violation of this Court's permanent injunction. Moreover, considerations of fairness dictate that the Court should permit SeaChange to present additional evidence—if it wishes to do so—before the Court determines whether to hold SeaChange in contempt. By separate Order, the Court will solicit the parties' proposals as to how the Court should now proceed.

---

the set-top box in the infringing ITV system. (*See* Tr. at 159 (Dr. Jeffay: "I think the important thing is what does the ITV system do with the Session ID.")